FILED

October 27 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0667

DA 13-0667

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 310

STATE OF MONTANA,

Plaintiff and Appellee,

v.

MICHAEL JEFFERY ROOT,

Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DC-12-116
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

Eileen Joyce, Silver Bow County Attorney, Samm Cox, Mike Clague,
Deputy County Attorneys, Butte, Montana

Submitted on Briefs:  August 19, 2015
Decided:  October 27, 2015

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Michael Root appeals from his February 2013 conviction after a jury trial of the offense of attempted deliberate homicide. We affirm.

¶2     Root presents the following issues for review:

¶3     Issue One: Whether Root's attorney was ineffective for not requesting an accomplice instruction.

¶4     Issue Two: Whether the District Court erred in denying Root's motion to dismiss based upon the prosecution's failure to disclose a video statement of a witness.

## BACKGROUND

¶5     This case began with events in Butte, Montana, on July 27, 2012, that resulted in Lawrence Lee being stabbed in the arm and neck and cut on his hand. This happened after defendant Root and a juvenile referred to as S.R. entered Lee's pickup truck and asked for a ride up the hill to Walkerville. Lee testified at trial that as the trio motored to and through Walkerville, Root pulled a knife and stabbed and cut him and said "This is for Jennifer Marshall." Lee testified that as the truck slowed S.R. jumped out the passenger side door and he (Lee) struggled with Root and eventually forced him from the cab. Lee then tried unsuccessfully to hit both S.R. and Root by backing the truck into them. He left the scene, stopping at a house for assistance. He did not notify the police because "you know, it's Butte, you don't call the cops."

¶6     S.R. testified that Root stabbed and cut Lee; that both he and Root ended up out of the truck trying to avoid Lee; and that both he and Root fled the scene. S.R. testified that he did not know Root or Lee, but that he saw the two together and offered them some

2

weed if they would give him a ride to a house in Walkerville. S.R. testified that after he jumped out of the truck he looked back and saw Lee and Root struggling and saw that Lee had been stabbed. S.R. testified that after Root and S.R. were out of the truck, Lee backed up and tried to hit them. S.R. testified that after Lee left, he (S.R.) took the knife from Root and buried it because he was afraid for his safety.

¶7 Root testified that he did not stab and cut Lee, but that S.R. did. He said that he met S.R. earlier in the day and saw him later when Lee and S.R. pulled up in Lee's truck and the ride began. Root testified that Lee attacked S.R. in the truck, and that when that started he got out. Root testified that when he saw that Lee had a knife, he intervened and fought with Lee inside the truck. He said that S.R. then pulled him out of the truck and Lee tried to run them down. On appeal Root summarizes his defense at trial as based on the argument that "he was innocent of attempted homicide and that he didn't use a knife."

## STANDARD OF REVIEW

¶8 Claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. *State v. Green*, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 798.

¶9 This Court reviews the denial of a motion to dismiss in a criminal case de novo to determine whether the decision was correct. *State v. Meredith*, 2010 MT 27, ¶ 24, 355 Mont. 148, 226 P.3d 571.

3

## DISCUSSION

¶10 *Issue One: Whether Root's attorney was ineffective for not requesting an accomplice instruction.*

¶11 This Court evaluates claims of ineffective assistance of counsel under the test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984) and *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. First the defendant must show that his attorney's performance was deficient by demonstrating that it fell below an objective standard of reasonableness. *Whitlow*, ¶ 14. There is a strong presumption that the attorney's performance fell within the wide range of reasonable professional assistance, *Whitlow*, ¶ 15, because there are "countless ways to provide reasonable assistance in any given case." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

¶12 Second, the defendant must show that his attorney's deficient performance prejudiced the defense. *Whitlow*, ¶ 10. This requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. An ineffective assistance claim that cannot be determined from the facts in the record can be reviewed in a petition for postconviction relief. *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095.

¶13 Root contends that his trial attorney should have requested a jury instruction that S.R. was legally accountable (an accomplice) for the charged offense and that his testimony must be viewed with distrust and must be corroborated. Sections 26-1-303(4) and 45-2-302, MCA. S.R. was not charged with any offense arising from this incident.

4

¶14 Even if an accomplice instruction could be given in a case if requested, an attorney does not necessarily provide ineffective assistance to his client by failing to request one. *State v. Johnson*, 257 Mont. 157, 162-63, 848 P.2d 496, 499 (1993) (where accomplice instruction conflicted with the defendant's claim that he did not commit the crime, not requesting an accomplice instruction was a "clear" tactical decision that did not support a claim of ineffective assistance). In this case Root's attorney did not provide ineffective assistance by not requesting an accomplice instruction because it would have conflicted with Root's defense that he did not stab Lee.

¶15 It is not proper to give an accountability/accomplice instruction where it is unsupported by the evidence and is inconsistent with the defendant's claim of innocence. *State v. Hall*, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239. Even where there was clearly an accomplice, the trial court is not required to give the accomplice instruction in every case, and counsel is not ineffective for failing to request the instruction where it would be inconsistent with the theory of defense. *Johnson*, 257 Mont. at 162-63, 848 P.2d at 499. Defense counsel is responsible for making the tactical decision to forego an accomplice instruction where it would be inconsistent with the theory of defense. *State v. Sheppard*, 270 Mont. 122, 129-30, 890 P.2d 754, 758 (1995). In the case of an inconsistent defense, this Court on appeal can determine from the face of the record that defense counsel made a "clear" tactical decision that does not constitute ineffective assistance. *Johnson*, 257 Mont. at 163, 848 P.2d at 499; *Kougl*, ¶ 18.

¶16 Root claims that, while he did not stab Lee, he committed an offense (assault) by fighting with Lee and therefore he did not claim that he was "totally innocent."

5

However, he claims that S.R. was an accomplice in the attempted deliberate homicide, a charge for which Root denies any culpability. His attorney was faced with defending based upon Root's version of the events. Defense counsel's trial tactics are necessarily constrained by the facts and evidence that will be considered by the jury. *State v. Morsette*, 2013 MT 270, ¶ 21, 372 Mont. 38, 309 P.3d 978.

¶17 We conclude that the performance of Root's attorney did not fall below an objective standard of reasonableness, and was within the wide range of reasonable professional assistance, *Whitlow*, ¶¶ 14-15. The Sixth Amendment of the United States Constitution guarantees that counsel perform with reasonable competence, and that success is not the test of effective counsel. Root has not demonstrated that but for counsel's performance the result would have been different. *Bomar v. State*, 2012 MT 163, ¶¶ 19, 23, 365 Mont. 474, 285 P.3d 396. Therefore we determine that Root's attorney was not ineffective in failing to offer an accomplice instruction.

¶18 *Issue Two: Whether the District Court erred in denying Root's motion to dismiss based upon the prosecution's failure to disclose a video statement of a witness.*

¶19 Between the second and third days of trial the State provided the defense with a copy of a recording of an interview between police and a previously-disclosed witness named Lonnie Boyd. The next morning defense counsel moved the District Court to dismiss the charges on the ground that the late disclosure of the recording was a violation of Root's right to due process under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Under *Brady*, a criminal defendant has a due process right to obtain exculpatory evidence held by the prosecution. To prevail on a *Brady* violation the defendant must

6

establish that the State possessed evidence favorable to the defense because of its exculpatory or impeachment value; that the prosecution willfully or inadvertently suppressed the evidence; and that suppression of the evidence prejudiced the accused. *State v. Fish*, 2009 MT 47, ¶ 20, 349 Mont. 286, 204 P.3d 681. However, a defendant's right to due process "is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense" and the defendant must demonstrate that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 437, 115 S. Ct. 1555, 1566, 1567 (1995).

¶20 The District Court held a hearing out of the presence of the jury on Root's motion to dismiss. After argument from counsel the District Court denied the motion to dismiss, holding that the recording of the Boyd interview was cumulative; that the defense knew about Boyd prior to the disclosure of the recording; that the defense knew Boyd had given a statement to officers; and that the defense knew that the police obtained a search warrant for a building in Butte based upon Boyd's statement. The District Court found that the defense in fact had Boyd available to testify at trial.

¶21 It is clear that the State had an obligation to disclose the Boyd statement earlier than it did, even though there is no contention that the prosecutor in Root's case knew about the recording prior to disclosing it to the defense. It is also clear that the Boyd statement had exculpatory value in that it provided evidence that S.R. had claimed that he, and not Root, stabbed the victim. It is also clear that the statement had impeachment value because it contradicted the testimony of S.R., who testified (along with the victim)

7

that Root was the culprit. At the same time, because Boyd testified at trial after disclosure of the recording of his statement, the jury heard his account of S.R.'s claim to have done the stabbing.

¶22 Additional facts about Boyd appear in the record. Boyd was not involved in the incident in which Lee was stabbed. Rather, Boyd was in police custody on unrelated charges, and about six days after the stabbing he offered to police that he would give a statement that S.R. had told him that S.R, and not Root, stabbed Lee. Boyd provided a recorded statement recounting his interactions with S.R. and about S.R.'s description of the stabbing. The police obtained a search warrant based upon Boyd's statement that S.R. showed him where the knife was hidden, but they found nothing during the search to corroborate Boyd's account.

¶23 In early December 2012 before trial, Root moved in limine that he be allowed to introduce the testimony of a police detective who had interviewed Boyd, because Boyd had told police that S.R. admitted to stabbing Lee. The State responded that the defense had been given Boyd's name, address and "all pertinent information." The State objected to introduction of the detective's testimony about Boyd's statement on the ground of hearsay. In January 2013 the State obtained and filed a subpoena issued to Boyd to secure his attendance at trial, and separately disclosed him (and his address) as a witness for the State. The District Court's order in January 2013 denied on hearsay grounds Root's motion that the police officer be allowed to testify what Boyd had said about what S.R. had said. In February 2013 the defense obtained and filed a subpoena to secure Boyd's appearance at trial.

¶24    The State called S.R. as a witness during its case-in-chief, before Boyd or Root testified. On cross-examination, Root's attorney asked S.R. whether he told Lonnie Boyd that S.R. had stabbed Lee. S.R. testified that he did not know Boyd and that it was "not true" that he claimed to have stabbed Lee.

¶25    After the District Court denied Root's motion to dismiss, the defense called Lonnie Boyd to testify at trial. Boyd testified for the defense that he talked to S.R. in person and on the phone after the stabbing. Boyd directly contradicted S.R.'s prior testimony that S.R. did not know Boyd and did not talk to him about the incident. Boyd testified that S.R. told him that S.R. had gotten a ride with Lee and had tried to rob him of drugs. Boyd testified that S.R. told him he stabbed Lee while fighting with Lee about the drugs. Boyd testified that he told law enforcement about S.R.'s claims after he heard that S.R. claimed that Boyd was present at the stabbing. Boyd testified that S.R. told him that he and Lee were also involved in some kind of transaction involving guns, but that the stabbing was about drugs. Boyd testified that S.R. showed him a knife that he claimed he used to stab Lee, and that the knife was with a number of guns in a "cubby hole" in a particular house in Butte. Boyd also testified that S.R. talked about a woman that he knew who may have been assaulted by the victim Lee, but that the assault was not the reason that Lee got stabbed. Boyd testified that he felt that S.R. wanted to be seen as a gangster and was telling the story about stabbing the victim to enhance his credibility in that regard.

¶26    Root contends that there were other critical impeachment facts in the recording of Boyd's statement to police. Those included the color of a knife that he says S.R. showed

9

him; that it was wrapped in "old fabric"; that while S.R. tried to posture as a criminal, he came across as a "nutty gangster"; and that Boyd had seen him pull a gun. These aspects of the Boyd statement, which Root's defense knew about before Boyd testified, were cumulative at best.

¶27 Unlike most *Brady* cases, Root obtained the recording of the interview before the conclusion of the trial and at a time when he could use it in his defense. Root argues that prior knowledge of the contents of the recording could have allowed different questioning of S.R., who had already testified for the State. However, the only relief he sought from the District Court was dismissal of the charges. He did not seek to recall S.R. and examine or cross examine him based upon information in the recording.[1]

¶28 While Boyd's statement about what S.R. told him was clearly exculpatory, Root obtained the statement during trial. Root also took advantage of the impeachment value of Boyd's statement, directly contradicting S.R.'s earlier testimony. Root argues that there were additional details in Boyd's recorded statement that he could have used to impeach S.R. when he originally testified. It is clear that Boyd's trial testimony as given substantially conflicted with and, if believed, substantially impeached S.R.'s testimony that Root stabbed the victim. The jury heard Boyd testify and heard him give his account of S.R.'s purported confession to the crime. Root presented this potentially exculpatory evidence to the jury, which determined nonetheless that Root stabbed the victim. He was

---

[1] A defendant may subpoena a witness to testify at his trial, § 46-15-101, MCA, and may be entitled to a continuance of the trial in order to serve a subpoena on a critical witness, *State v. Timblin*, 254 Mont. 48, 51, 834 P.2d 927, 928-29 (1992).

10

entitled to present the testimony, as he did, but it was the province of the jury to believe it or not.

¶29     While S.R. may have been "excused from his subpoena" after testifying in the State's case-in-chief, there is no showing that S.R. was "long gone" or that he could not have been subpoenaed again to testify in the defense case.  Root's attorney made the tactical decision to not seek to recall S.R. after disclosure of the Boyd statement but to seek dismissal of the charges.

¶30     We conclude that the late disclosure of the Boyd statement was not prejudicial to Root's defense.  The narrow issue here is whether not having Boyd's statement before S.R. testified prejudiced Root's right to a fair trial.  Root has not demonstrated that the impeachment value of Boyd's recorded statement was sufficient to undermine confidence in the verdict.  We conclude that Root did receive a fair trial; that the jury heard fully and fairly the testimony about each of the various versions of the stabbing story; and that the resulting verdict is "worthy of confidence." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566. Consequently, the late disclosure of the recording did not violate Root's right to obtain exculpatory evidence under *Brady*.

¶31     Affirmed.


                                        /S/ MIKE McGRATH

We Concur:

/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE

11

Justice Patricia Cotter, dissenting.

¶32 I dissent from the Court's Opinion. I would not reach Issue One. I would conclude that the District Court erred in denying Root's motion to dismiss based upon the prosecution's failure to disclose the Boyd video statement to Root prior to trial.

¶33 As the Court notes at ¶ 19, in order to establish a *Brady* violation, a defendant must establish that the State possessed evidence favorable to the defense, that the evidence was inadvertently or willfully suppressed, and that suppression of the evidence prejudiced the accused. *Fish*, ¶ 20. Otherwise stated, a successful *Brady* petitioner must demonstrate that "there is a reasonable probability" that the result of the trial might have been different had the suppressed evidence been properly disclosed. *Strickler v. Greene*, 527 U.S. 263, 289-90, 119 S. Ct. 1936, 1952 (1999) (citing *Kyles*, 514 U.S. at 434-35).

¶34 The Court maintains that because Root obtained the recording of the interview with Boyd before the conclusion of the trial, he was able to use the statement in his defense. Opinion, ¶ 27. While it is true that Root was able to elicit some of the details of Boyd's statement to the police by calling Boyd to the witness stand after the State rested, he was completely deprived of the opportunity to paint the State's chief witness as a liar *during* the State's presentation of its case. Had Root been provided with S.R.'s statement prior to trial, he could have impeached the State's witness while he sat on the stand; instead, S.R.'s testimony was essentially uncontradicted until Root was able to call Boyd as a witness in his case. Respectfully, an effective impeachment of the State's key witness places reasonable doubt in the minds of jurors from the outset, and therefore packs a far greater punch than a belated offer of testimony during the defendant's case.

12

¶35 Boyd provided the police with many non-cumulative details about S.R., including his mother's name and address, the names of many of his friends, the name of his girlfriend, and the nature of his interests and proclivities. As defense counsel argued, had he been possessed of this information before trial, he could have used it to impeach S.R.'s assertion at trial that he did not even know Boyd. He also could have asked S.R. about other information contained in the statement, such as the fact that Boyd met with S.R. on the day of the stabbing while S.R. was in possession of a bloody knife, and that S.R. told Boyd that Root "was just sitting around," and did not participate in the stabbing. Defense counsel could have asked S.R about many things revealed in Boyd's statement, had it been provided to him prior to trial as the law requires. However, he had no opportunity to utilize the valuable information contained in the Boyd statement to impeach S.R., because the statement was only provided to him *after* S.R. testified, and only after the State requested and the court allowed S.R. to be "permanently excused from his subpoena."

¶36 There is no question that the State possessed evidence favorable to the defense, and that it failed to provide the evidence to Root in advance of trial. The only question remaining in the *Brady* analysis is whether suppression of the evidence prejudiced Root. It clearly did. Three persons were in the vehicle when the stabbing occurred—the defendant, the victim, and S.R.—and the three provided radically different versions of what occurred prior to, during and after the stabbing. One cannot state for certain that the outcome of the case would have been different had Root been provided with the Boyd

13

statement prior to trial; however, a fully informed impeachment of S.R. would have surely undermined S.R.'s credibility, which was central to the State's case.

¶37 Root's inability to present his most persuasive case is not his fault; the fall lies clearly with the State. The Ninth Circuit has recently emphasized that "[t]he prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014). The court observed that the "requirement of due diligence would flip that [disclosure] obligation, and enable a prosecutor to excuse his failure by arguing that defense counsel could have found the information himself. The proposition is contrary to federal law as clearly established by the Supreme Court, and unsound public policy." *Amado*, 758 F.3d at 1136 (internal citations omitted).

¶38 In addressing the "reasonable probability that the outcome of the trial would have been different" component of the *Brady* test, the United States Supreme Court stated: "the adjective [reasonable] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Root did not receive a fair trial. Had defense counsel been in possession of the Boyd statement at the time he cross-examined S.R., he could have asked S.R. pointed factual questions premised upon Boyd's statements. Had S.R. then denied the truth of those statements, impeachment via a prior inconsistent statement would have been set, as the State itself acknowledged during the *Brady* arguments to the District Court. However, S.R. was long gone by the time the

14

State provided the defendant with the Boyd statement, having been permanently released from his subpoena at the State's request. Thus, the defendant irretrievably lost the opportunity to conduct a meaningful cross-examination and impeachment of the State's critical witness.

¶39 We err in blithely concluding that the late disclosure of the recording did not prejudice Root. Opinion, ¶ 30. It is equally troubling that we seemingly shrug off as insignificant the State's *Brady* violation. While I do not contend that the State intentionally withheld the Boyd statement until after it had rested its case, "inadvertent" suppression should not be so easily excused. As the Ninth Circuit's Chief Judge Kozinski famously observed in 2013, "[t]here is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, J., dissenting). I would conclude that the District Court erred in denying Root's motion to dismiss based upon the prosecution's *Brady* violation, and I therefore dissent from the Court's Opinion.

/S/ PATRICIA COTTER

Justices Laurie McKinnon and James Jeremiah Shea join in the dissent of Justice Cotter.

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA

15