DA 20-0078

FILED

05/31/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0078

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 104

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

STANLEY JOSEPH OLIVER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 19-185
Honorable Shane Vannatta, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Deborah S. Smith, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

            Kirsten H. Pabst, Missoula County Attorney, Ryan Mickelson, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  April 27, 2022

Decided:  May 31, 2022

Filed:

_____
                    Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Stanley Joseph Oliver appeals from his convictions for partner or family member assault (PFMA), unauthorized use of a motor vehicle, and two counts of tampering with witnesses or informants, in the Fourth Judicial District Court, Missoula County. The restated issues on appeal are:

*1. Did the District Court abuse its discretion when it allowed two law enforcement officers to testify about out-of-court statements made by the State's two lead witnesses?*

*2. Was Oliver's right to a fair trial by an impartial jury violated when the District Court declined to interview a juror who told one of the State's witnesses he was brave after testifying?*

*3. Was Oliver's right to confrontation violated by the repeated emphasis on recorded jail phone calls?*

*4. Did Oliver receive ineffective assistance of counsel when counsel did not object to the repeated use of the recorded jail calls at trial and encouraged the jury during closing arguments to relisten to the recorded jail calls during jury deliberations?*

*5. Is Oliver entitled to a new trial based on the cumulative error doctrine?*

*6. Did the District Court err in imposing jury and other costs on Oliver without first undertaking an ability to pay inquiry?*

¶2 We affirm Oliver's convictions. We reverse the District Court's imposition of various fees and costs on Oliver and remand for the District Court to undertake the appropriate ability to pay inquiry before imposing those costs on Oliver.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Alyson Robbins and Oliver were in a tumultuous on again, off again, relationship for two years. They both lived an itinerant lifestyle, often staying with friends and family,

2

in hotels, or at homeless shelters around Lake, Missoula, and Flathead Counties. In early March 2019, the two were on again after several months apart. After reconnecting, they went to Missoula in search of a used pickup truck to purchase. Robbins testified she purchased the truck with money from her tax return. Oliver testified he provided the money to purchase the truck from his earnings doing construction work. The bill of sale was made out to Robbins. About a week later, Oliver, Robbins, and her two minor daughters went to stay with Clayton Pierre in his trailer outside Arlee, Montana.

¶4      On the morning of March 20, 2019, deputies responded to Pierre's trailer home after a phone call to 9-1-1 was hung up. Deputies found Pierre, Robbins, and her two children at the scene. Robbins's face and hair were covered in dried blood, she had a cut above her left eye, and she had bruising and minor cuts on her back. Robbins told the deputies Oliver had strangled her the previous evening and tackled and hit her that morning and caused the injuries. She also relayed to the deputies Oliver had left and taken her truck without her permission. Pierre corroborated Robbins' account of the attack that morning to the deputies. Oliver was arrested later that day at his mother's home, where the truck was also found. Oliver was charged with one count of strangulation of a partner or family member, a felony, in violation of § 45-5-215, MCA; one count of PFMA, a felony, in violation of § 45-5-206, MCA, and unauthorized use of a motor vehicle, a misdemeanor, in violation of § 45-6-308(1), MCA.

¶5      Oliver did not make bail and was detained at the Missoula County Detention Facility pending trial. Jailhouse records showed Oliver called Robbins from the jail at least

seventy-seven times. Robbins answered seven of those calls between March 24 and April 6. Based on the content of those calls the State added two counts of tampering with a witness or informant, both felonies, in violation of § 45-7-206, MCA.

¶6 Oliver and the State largely agreed on what portions of the jailhouse calls were admissible for trial. Oliver sought to have a few additional seconds admitted in which Oliver alleged Pierre was using heroin. The court ruled those additional portions of the calls were admissible under M. R. Evid. 403 as they could explain Robbins's reactions to Oliver on the calls. The admitted portions of the jailhouse calls were played in their entirety at trial and shorter portions of the calls were repeated throughout trial and again during the State's closing arguments. In the calls, Oliver repeatedly encouraged Robbins to "amend" her statement, to tell officers she would not testify against him, and to leave Montana and move to Spokane.

¶7 At trial, the State called Robbins, Pierre, two deputies from the Missoula County Sheriff's Office, and an investigator from the County Attorney's office to testify. Oliver testified in his own defense. While on the stand, Robbins had difficulty providing a linear timeline of events. She described a chaotic series of altercations and violent attacks from Oliver occurring in the living room, their shared bedroom, outside the trailer, around her truck, and in Pierre's bedroom. She testified Oliver took her truck without her permission and tried to get the paperwork for the truck from her. Similarly, Pierre struggled to recall details and had difficultly recalling how long he had known Oliver. He testified he had a head injury that affected his memory. Both were consistent Oliver tackled and hit Robbins

4

in Pierre's room in front of Pierre on the morning of March 20, 2019, causing Robbins's injuries. They both testified Robbins fell onto a bucket and broke the bucket. A photo of a shattered bucket deputies found in Pierre's room was entered into evidence.

¶8 The District Court also admitted testimony from the investigating deputies about what Robbins and Oliver had told them the morning of March 20, 2019, over Oliver's hearsay objections. Oliver's counsel objected on hearsay grounds seven times during the testimony of the two deputies who responded to the scene. During the testimony of Deputy Paul Von Gontard, Oliver first objected when Von Gontard began relaying what Pierre told him at the scene. The prosecutor argued "the jury has heard from Mr. Pierre already, so we've established what he said. And additionally, this is for affect [sic] on the listener in establishing his steps after response." The court overruled Oliver's objection. Von Gontard then testified Pierre told him "there had been a 'domestic.'" Oliver next objected when the prosecutor asked Von Gontard what Robbins had told him about the truck. The prosecutor responded he had the "same response" as to the prior hearsay objection. Oliver contended the statement was an out-of-court statement offered for its truth and therefore needed to fall under an exception to the hearsay rule to be admissible. The court explained "it's not made by an out-of-court declarant, because she testified," and overruled the objection again. Von Gontard explained Robbins told him she had purchased the truck, but Oliver believed it belonged to him and tried to take it away from her. Robbins told Von Gontard she and Oliver had gotten into a physical altercation over Oliver trying to take the truck and the paperwork for the truck. Oliver again reiterated the hearsay objection

5

after Von Gontard testified Robbins told him Pierre had hidden the paperwork for the truck to help her and prevent Oliver from getting the paperwork. Oliver objected on hearsay grounds again when the prosecutor asked Von Gontard what Robbins told him had occurred the prior evening. The court overruled the hearsay objection again, stating it "doesn't believe that it meets the hearsay objection, because Ms. Robbins has given testimony, and this testimony, presumably, is provided to either confirm or potentially vary the state of mind of Ms. Robbins." After this ruling, Oliver's counsel noted for the record proper foundation had not been established to admit the statements as prior consistent statements. Von Gontard then explained Robbins had told him Oliver had strangled her the prior evening by holding his knee against her throat.

¶9 During the testimony of Deputy Josh Edison, Oliver objected on hearsay grounds when the prosecutor asked what Pierre told Edison. Oliver's counsel explained the question called for an out-of-court statement offered for the truth of the matter asserted and "[i]t falls under the definition of hearsay." The court again overruled the objection. Edison then testified Pierre told him he heard an argument between Oliver and Robbins, the argument moved into Pierre's room, Oliver threw Robbins to the ground, and Oliver got up and left when Pierre told him to stop. When the prosecutor next asked what Robbins had told Edison, Oliver again objected on hearsay grounds, which the court overruled. Edison went on to testify Robbins told him there had been an argument outside and she had picked up a golf club and at some point, Oliver had picked up an axe. Later, the prosecutor asked Edison what Robbins told him had happened the previous evening.

6

Oliver once again objected on hearsay grounds, which the court overruled. Edison then testified Robbins told him there had been an argument over a blanket in the living room and Oliver had pushed her down and put his knee on her throat three separate times. Robbins told Edison she had a sore throat and a sore tongue.

¶10 Oliver provided a much different account of the events. Oliver testified he did not know how Robbins sustained the injuries to her face and back, but he saw her trip in the doorway of their bedroom as he ran out of the trailer during an argument in the early morning hours of March 20. He testified he drove to his mother's house at that point and did not return. He also testified he paid for the truck and trusted Robbins to handle the paperwork while he was at work the next day and had no idea only her name appeared on the title. Oliver further explained he was not trying to convince Robbins to flee the State or to lie to law enforcement in the jailhouse calls but rather was discussing their prior plan to move to Spokane together and trying to convince her to tell the truth when he told her repeatedly to "amend" her statement.

¶11 On the morning of the second day of trial, the State informed the court Cheryl Patch, a crime victim advocate, overheard a juror say something about being brave to Pierre in the hallway after his testimony. The court interviewed Patch, who explained she was standing in the hall with Pierre when the jurors filed by. As they passed, a juror "said something about him being brave." She said no one responded in any way to the comment and she was not sure if anyone else heard it. She thought the juror who spoke was an older woman with white hair. Based on that description, the State told the court it thought the

juror might be the alternate. The court asked Patch to remain in the courtroom when the jury came in to start the day and determine which juror had spoken to Pierre and to inform the court outside the presence of the jury. The court told the parties it was not going to take immediate action but would wait for a better identification from Patch at which point the court may interview the juror. The court stated it would admonish the jury not to talk to anyone and remind them not to draw conclusions about the case until the completion of evidence.

¶12 During a break in the trial, Oliver's counsel again raised the issue of the juror speaking to Pierre. After looking at the jury and based on Patch's description she believed the juror was Juror 12, not the alternate. The State agreed. Oliver's counsel raised concerns about Juror 12's "ability to be fair, and to follow the Court's instructions that have already been given about not forming an opinion prior to [the] completion of evidence." The court stated it would continue forward until it had a positive identification from Patch but asked the parties to consider substituting Juror 12 with the alternate.

¶13 At the next break, Oliver's counsel informed the court Oliver and the State had agreed to excuse Juror 12 in favor of the alternate stepping in. The State told the court Patch had emailed she was "fairly certain" it was Juror 12. The court granted Oliver's motion and stated it would substitute the alternate prior to sending the jury to deliberate.

¶14 At the end of day 2, Oliver's counsel asked the court to excuse the rest of the jury for the evening and bring Juror 12 to the courtroom for questioning about what had occurred and whether she had "already made a prejudgment about the case." The court

informed the parties it did not want to taint or interfere with the jury process and declined to exclude her immediately "[g]iven right now there is no apparent harm," but "if she is going to deliberate with the jury . . . she would be subject to inquiry." The parties then moved onto finalizing jury instructions. After closing arguments the next day, the court informed the jury only twelve jurors were needed to deliberate and Juror 12 was being dismissed by stipulation of the parties.

¶15 During the State's closing, the State played portions of the recorded jailhouse calls and argued Oliver sought to exert control over Robbins and threatened her to get her to change her story or flee the State to get the charges against him dropped. The State further emphasized portions of the calls where Robbins accused Oliver of taking her truck and hurting her, which Oliver did not deny and for which he apologized during some of their conversations. During her closing, Oliver's counsel encouraged the jury to relisten to the jailhouse calls if necessary. Oliver's counsel insisted when listened to in their entirety the recordings supported Oliver's position he was not trying to get Robbins to lie or to flee the State but was trying to help Robbins get the truck back from his mother's house and discuss their prior plans to move to Spokane.

¶16 During deliberations, the jury asked to hear the jailhouse calls again. Oliver did not object to the request but asked the calls to be played in their entirety. The calls were played in their entirety in the courtroom with the attorneys and Oliver present.

¶17 The jury convicted Oliver of four counts: PFMA, unauthorized use of a motor vehicle, and two counts of tampering with a witness. The jury acquitted him of

9

strangulation of a partner of family member. The District Court sentenced Oliver to the Department of Corrections for 5 years, 2 suspended, for PFMA; 6 months, all suspended, for unauthorized use of a motor vehicle; and 10 years, 5 suspended, on each of the tampering charges to all run concurrently. Oliver appeals.

## STANDARD OF REVIEW

¶18 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Smith*, 2021 MT 148, ¶ 14, 404 Mont. 245, 488 P.3d 531. "A district court abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *Smith*, ¶ 14. To the extent an evidentiary ruling is based on a conclusion of law, we review "whether the court correctly interpreted the law." *Smith*, ¶ 14 (quoting *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, 173 P.3d 690).

¶19 We review rulings on motions to interrogate a juror for an abuse of discretion. *State v. Cunningham*, 2018 MT 56, ¶ 8, 390 Mont. 408, 414 P.3d 289.

¶20 Our review of constitutional questions is plenary. *State v. Lamoureux*, 2021 MT 94, ¶ 10, 404 Mont. 61, 485 P.3d 192. If no contemporaneous objection is made, we discretionarily may review claimed errors that implicate a criminal defendant's fundamental constitutional rights under plain error review. *State v. Clemans*, 2018 MT 187, ¶ 4, 392 Mont. 214, 422 P.3d 1210.

¶21 Claims of ineffective assistance of counsel are mixed questions of law and fact, which we review de novo. *State v. Weber*, 2016 MT 138, ¶ 11, 383 Mont. 506, 373 P.3d 26.

¶22 We review a criminal sentence imposing over one year of incarceration for legality. *State v. Moore*, 2012 MT 95, ¶ 10, 365 Mont. 13, 277 P.3d 1212. We review de novo whether the court adhered to the applicable sentencing statute. *Moore*, ¶ 10.

## DISCUSSION

¶23 *1. Did the District Court abuse its discretion when it allowed two law enforcement officers to testify about out-of-court statements made by the State's two lead witnesses?*

¶24 Oliver argues the District Court erred in allowing the deputies to testify to out-of-court statements from Robbins and Pierre over his objection. Oliver maintains these statements were hearsay and did not fall under any exceptions to the prohibition on hearsay and could not be admitted as prior consistent statements under M. R. Evid. 801(d)(1)(B). Oliver argues the error was not harmless, as the testimony from the officers was needed to bolster the testimony from the State's two unreliable lead witnesses.

¶25 The State concedes the statements from the deputies were not admissible under Rule 801(d)(1)(B) as prior consistent statements to rebut an allegation the statements were recently fabricated. The State contends instead the statements were admissible as prior inconsistent statements, as both Robbins and Pierre had memory lapses and memory lapses are inconsistencies under Rule 801(d)(1)(A). The State maintains any error in admitting the statements was harmless.

¶26 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). As a general rule, hearsay statements are not admissible. M. R. Evid. 802. Under M. R. Evid. 801(d)(1), a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive.

A claimed lapse in memory may be an inconsistency if the lapse in memory is "regarding prior declarations of fact [the witness] *actually made*." *Smith*, ¶ 27. Mere omissions are not inconsistencies. *See Smith*, ¶ 31.

¶27 A review of the record shows the statements to which Oliver objected were consistent with what Robbins and Pierre had already testified. While the State points to parts of Robbins's and Pierre's testimonies where they testified to a lack of recollection, the statements from the officers did not fill in those gaps. Rather, the hearsay statements simply reiterated what Robbins and Pierre testified to in open court. These consistent statements were not admissible under Rule 801(d)(1)(A) or (B). The District Court erred as a matter of law in admitting the statements on the ground Robbins and Pierre had already testified. The hearsay rule prohibits out-of-court statements admitted for the truth of the matter asserted unless an exception applies, regardless of whether the declarant testifies in court.

¶28 Not every error committed by a district court is reversible, however. Only prejudicial errors require reversal. *See* § 46-20-701(1), MCA. When improperly admitted statements prove an element of the offense, their admission is harmless error when "admissible evidence . . . proves the same facts as the tainted evidence" and "the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *McOmber*, ¶ 26. Prior consistent statements have "a minimal effect on the trial" if they do "no more than repeat admissible in-court testimony" and their content is "not inflammatory" or "more compelling or deserving of greater evidentiary weight" than the admissible in-court testimony. *McOmber*, ¶ 35.

¶29 All the statements the deputies testified to were consistent with and cumulative of the testimonies of Pierre and Robbins and other evidence. The testimony from the deputies related to the charges of PFMA, unauthorized use of a motor vehicle, and strangulation. The jury convicted Oliver of PFMA and unauthorized use of a motor vehicle and acquitted him of strangulation. Both Pierre and Robbins corroborated the events underlying the PFMA charge—Oliver tackled Robbins in Pierre's room onto a bucket and caused her injuries. A photograph from the scene showed a shattered bucket in Pierre's room. Robbins testified she and Oliver fought over the paperwork to the truck, which was in her name only. The paperwork was entered into evidence and also showed the truck was in Robbins's name alone. The testimony from Robbins and the deputies regarding Oliver's strangulation of her the prior evening, which lacked other corroborating evidence, was not accepted by the jury, as they acquitted him of this charge. These circumstances

13

demonstrate the jury did not rely on the bolstering done by the deputies but considered the other evidence before them in reaching their verdict. The deputies' testimony repeated admissible in-court testimony and their testimony was not more compelling or deserving of greater evidentiary weight under the circumstances here. The admission of the hearsay statements was harmless error.

¶30  *2. Was Oliver's right to a fair trial by an impartial jury violated when the District Court declined to interview a juror who told one of the State's witnesses he was brave after testifying?*

¶31  Oliver argues the District Court violated Oliver's right to a fair trial by an impartial jury when it declined to interview Juror 12 after learning she told Pierre he had been brave for testifying. Oliver argues the presumption of prejudice to him was unrebutted and he is entitled to a new trial.

¶32  A trial court "has significant latitude when ruling on" matters relating to juror misconduct and we will give "considerable weight" to its determinations, as "the trial court is in the best position to observe the jurors and determine the potential for prejudice when allegations of jury misconduct are raised." *State v. Gollehon*, 262 Mont. 293, 303, 864 P.2d 1257, 1263-64 (1993).

¶33  Oliver relies on *State v. Eagan* and *State v. Stringer* for the proposition "if jury misconduct is shown tending to injure the defendant, prejudice to the defendant is presumed; however, the presumption is not absolute and may be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." *State v. Eagan*, 178 Mont. 67, 79, 582 P.2d 1195, 1202 (1978); *see also State*

14

*v. Stringer*, 271 Mont. 367, 383-84, 897 P.2d 1063, 1073 (1995). This presumption imputes the prejudicial effect of any misconduct on the part of one juror to the entire jury panel—thus it presumes any prejudicial juror misconduct violated a defendant's rights to an impartial jury. In *Eagan*, we explained "[w]hen a juror is found to have been guilty of improper conduct, such improper conduct is charged to the entire panel," unless such presumption is rebutted by the State. *Eagan*, 178 Mont. at 78, 582 P.2d at 1201. Our later cases have clarified this presumption imputing any prejudice against the defendant to the entire jury panel arises "only after there has been a threshold showing of misconduct which *injures* or *prejudices* the defendant." *State v. McNatt*, 257 Mont. 468, 472, 849 P.2d 1050, 1052-53 (1993). We have explained this means the "alleged jury misconduct must affect a material matter in dispute and prejudice the complaining party." *McNatt*, 257 Mont. at 472, 849 P.2d at 1053 (quoting *State v. Sor-Lokken*, 247 Mont. 343, 353, 805 P.2d 1367, 1374 (1991)). Thus, an allegation of jury misconduct does not give rise to a presumption the alleged misconduct was prejudicial to the defendant in and of itself. Rather, only if the alleged misconduct tends to cause an injury or prejudice to the defendant, then a presumption arises the entire jury panel is prejudiced against the defendant. The facts of *Eagan*, *Stringer*, *Gollehon*, and *McNatt* illustrate this distinction.

¶34    In *Eagan*, a juror went out to a bar after the second day of a trial for mitigated deliberate homicide. The juror told a fellow bar patron "he was on the jury . . . and as far as he was concerned [the defendant] was guilty" and "half the jury" were friends of the deceased victim. *Eagan*, 178 Mont. at 70, 582 P.2d at 1197. When questioned, the juror

maintained anything he said was a joke and denied discussing the case with any of the other jurors. *Eagan*, 178 Mont. at 72-73, 582 P.2d at 1198. The court replaced the juror with the alternate and did not question the rest of the jury at any point about whether the disqualified juror had discussed the case with any of them. This Court reversed and remanded the case for a new trial. We explained the juror's misconduct was "charged to the entire panel." *Eagan*, 178 Mont. at 78, 582 P.2d at 1201. The juror's alleged statements tended to show injury or prejudice to the defendant's right to an impartial jury on their face—he stated he had already decided the defendant's guilt before the close of evidence and further indicated half the jury panel were friends with the victim. Given the nature of the allegations, prejudice to the defendant was presumed but the presumption could "be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." *Eagan*, 178 Mont. at 79, 582 P.2d at 1202. We explained this could have been accomplished through questioning the jury after they had reached a verdict but before the verdict was announced about whether the disqualified juror had discussed the case with any of them. *Eagan*, 178 Mont. at 78-79, 582 P.2d at 1201. As no evidence was produced to prove the defendant was not prejudiced, the presumption of prejudice remained and the defendant's right to a fair trial was violated.

¶35 In *Stringer*, the defendant was convicted of aggravated kidnapping and assault of his ex-wife. *Stringer*, 271 Mont. at 370, 897 P.2d at 1065. Before trial, the defendant and his ex-wife reconciled and remarried. *Stringer*, 271 Mont. at 370, 897 P.2d at 1065. The testimony the wife eventually gave at trial differed significantly from her prior statements

16

to police and she testified her prior statements were false. *Stringer*, 271 Mont. at 372, 897 P.2d at 1066. After the jury was empaneled but before any witnesses were called, defense counsel informed the district court the wife knew one of the jurors and "there had been problems between" the juror and the wife. *Stringer*, 271 Mont. at 383, 897 P.2d at 1072-73. The court declined to interview or remove the juror, reasoning the juror "doesn't really know them to that degree" as the juror had not disclosed the information when asked during voir dire. *Stringer*, 271 Mont. at 383, 897 P.2d at 1073. This Court reversed, explaining there was no factual basis for the district court to conclude the juror's failure to report she knew the wife meant she did not know the wife or defendant very well, rather than concluding the juror intentionally concealed the information during voir dire. *Stringer*, 271 Mont. at 383, 897 P.2d at 1073. Prejudice to the defendant from intentional concealment of bias against the wife—whose change in story would likely have to be believed for the defendant's acquittal—was "inherent in the circumstances." *Stringer*, 271 Mont. at 384, 897 P.2d at 1073. Thus, the presumption of prejudice attached and required further inquiry from the district court to dispel it. As the presumption of prejudice went unrebutted, this Court reversed the case for a new trial. *Stringer*, 271 Mont. at 384, 897 P.2d at 1073.

¶36 In *Gollehon*, a brief conversation occurred between one or two jurors and a correctional officer who was providing security at the courthouse and who had testified earlier in the trial. *Gollehon*, 262 Mont. at 302, 864 P.2d at 1263. The correctional officer was questioned in chambers and testified the conversation was about the Montana State

University football team and he did not realize he was talking to members of the jury. *Gollehon*, 262 Mont. at 302, 864 P.2d at 1263. Based on this testimony, the district court declined to interview the jurors or to grant a mistrial. This Court affirmed, explaining no presumption of prejudice attached as there was no "threshold showing of misconduct which *injures* or *prejudices* the defendant." *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264 (quoting *McNatt*, 257 Mont. at 472, 849 P.2d at 1052-53)). The conversation was a brief, casual exchange right outside the courtroom and the circumstances did not suggest or tend to show injury or prejudice to the defendant.

¶37 In *McNatt*, the defendant was convicted of felony sexual assault of a child. *McNatt*, 257 Mont. at 469, 849 P.2d at 1051. During trial, the defendant's nine-year-old stepdaughter testified the victim told her about the assault the night it occurred. *McNatt*, 257 Mont. at 469, 849 P.2d at 1051. On cross-examination, defense counsel sought to impeach the stepdaughter on the issue of when the victim told her about the sexual assault. *McNatt*, 257 Mont. at 469-70, 849 P.2d at 1051. Defense counsel asked the stepdaughter four different times during cross-examination if she remembered previously telling defense counsel the victim did not tell her about the assault until the next day. *McNatt*, 257 Mont. at 470, 849 P.2d at 1051. Each time in response to being asked whether she remembered she had given a different answer to defense counsel before trial, the stepdaughter got upset and started to cry and responded no. *McNatt*, 257 Mont. at 470, 849 P.2d at 1051. After the fourth time defense counsel asked this question, a juror interrupted the proceedings and stated "Your honor, I cannot sit through anymore questioning to this little girl. If I am in

18

contempt of court, I am in contempt, and I will settle with you. I must be excused right now if this questioning is going to continue." *McNatt*, 257 Mont. at 470, 849 P.2d at 1051. The district court agreed with the juror and ordered the stepdaughter to be taken off the stand. The defendant sought a mistrial based on the juror's inability to remain fair and impartial and the potential prejudicial effect of this incident on the entire jury panel. *McNatt*, 257 Mont. at 470, 849 P.2d at 1051-52. Alternatively, the defendant sought removal of the juror. *McNatt*, 257 Mont. at 470, 849 P.2d at 1052. The district court denied both motions. The district court found no prejudice to either side, explaining the outburst "may have indicated the juror's sympathy for the witness, [but] it did not mean he was 'for or against the defendant.'" *McNatt*, 257 Mont. at 470, 849 P.2d at 1052. This Court affirmed. A presumption of prejudice to the defendant did not arise as there was "no initial showing that the juror's outburst resulted in prejudice to" the defendant. *McNatt*, 257 Mont. at 472, 849 P.2d at 1053. The witness was not the victim and was being cross-examined on a matter not directly related to the elements of the alleged crime. The juror's comment "did not indicate any hostility toward the defendant, nor did it indicate that the juror had formed an opinion in relation to the defendant." *McNatt*, 257 Mont. at 472, 849 P.2d at 1053. The comment simply demonstrated the juror "felt sorry for the little girl" when she became upset on the witness stand. *McNatt*, 257 Mont. at 472, 849 P.2d at 1053. Without the threshold showing of prejudice, the burden did not shift to the State to prove the jury panel was not prejudiced and the district court did not abuse its discretion in

declining to declare a mistrial or to replace the juror with an alternate. *McNatt*, 257 Mont. at 473, 849 P.2d at 1053.

¶38 Like in *McNatt*, the fleeting comment from Juror 12 to Pierre, who was not the victim of the crime, displayed sympathy for the witness, but "did not indicate any hostility toward the defendant, nor did it indicate that the juror had formed an opinion in relation to the defendant." *McNatt*, 257 Mont. at 472, 849 P.2d at 1053. Oliver has thus failed to meet the threshold requirement the alleged misconduct tended to injure or prejudice him, which would have imputed that injury or prejudice to the entire jury panel and shifted the burden to the State to dispel the presumption. Oliver's suggestion on appeal Juror 12 might have expressed opinions to other jurors while the case was being tried is pure speculation. There was no indication or allegations of such conduct before the District Court and there is no presumption Juror 12's actions prejudiced the rest of the panel against him, as the alleged misconduct did not tend to injure or prejudice Oliver. While the District Court would have been within its discretion to immediately remove Juror 12 from the panel, question her about her interaction with Pierre, or admonish her not to speak to anyone, the District Court did not abuse its discretion in failing to do so. In fact, "[t]his Court has affirmed the use of alternate jurors to avoid a mistrial where no prejudice has been shown to a defendant from juror conduct." *State v. Close*, 267 Mont. 44, 49, 881 P.2d 1312, 1315 (1994) (citing *State v. Pease*, 222 Mont. 455, 724 P.2d 153 (1986) and *State v. Baugh*, 174 Mont. 456, 571 P.2d 779 (1977)). "The District Court was in the best position to evaluate the incident, and in the absence of a showing of prejudice, we will defer to the

20

court's determination that the alleged jury misconduct did not entitle [the defendant] to a mistrial." *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264. The District Court's decision to make Juror 12 the alternate and not have her deliberate with the rest of the panel was a reasonable and cautious remedy in light of the facts before the court.

¶39 *3. Was Oliver's right to confrontation violated by the repeated emphasis on recorded jail phone calls?*

¶40 Oliver asks this Court to conduct plain error review of the violation of Oliver's right to confrontation by the repeated use of the recorded jail phone calls during trial. Oliver's counsel did not object to the repeated playing of the recordings at trial and in fact, encouraged the jury to relisten to the recordings during deliberations in her closing arguments.

¶41 Generally, we will not review an issue not objected to at trial. *See State v. Lawrence*, 2016 MT 346, ¶ 6, 386 Mont. 86, 385 P.3d 968. Plain error review is proper "in situations that implicate a defendant's fundamental constitutional rights," and where "failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Lawrence*, ¶ 9 (quoting *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506.

¶42 Oliver fails to allege a violation of his right to confrontation under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution. Rather, Oliver alleges violations of § 46-16-503(2), MCA, and the related common law rule limiting the rehearing or replaying of testimonial evidence during jury

deliberations. *See State v. Hoover*, 2021 MT 276, ¶ 17, 406 Mont. 132, 497 P.3d 598.

Oliver cites no authority and makes no argument how a violation of § 46-16-503(2), MCA, and the related common law rule amounts to a violation of the constitutional right to confrontation. We will not "conduct legal research on behalf of a party" or "develop legal analysis that might support a party's position." *State v. Cybulski*, 2009 MT 70, ¶ 13, 349 Mont. 429, 204 P.3d 7. As Oliver's claimed error fails to implicate his fundamental constitutional rights, we decline to invoke plain error review.

¶43 *4. Did Oliver receive ineffective assistance of counsel when counsel did not object to the repeated use of the recorded jail calls at trial and encouraged the jury during closing arguments to relisten to the recorded jail calls during jury deliberations?*

¶44 Oliver argues his counsel provided him with ineffective assistance when his counsel failed to object to the repeated playing of the jailhouse phone calls during trial and encouraged the jury to relisten to the recordings during deliberations.

¶45 Criminal defendants have a right to effective assistance of counsel. *See* U.S. Const. amend. VI; Mont. Const. art. II, § 24; *Weber*, ¶ 21. To show ineffective assistance of counsel, a defendant must prove counsel's performance was deficient and counsel's deficient performance prejudiced the defense. *State v. Polak*, 2021 MT 307, ¶ 23, 406 Mont. 421, 499 P.3d 565. We will only review allegations of ineffective assistance of counsel on direct appeal when the claim is "based on facts of record in the underlying case." *State v. White*, 2001 MT 149, ¶ 12, 306 Mont. 58, 30 P.3d 340. When "the allegations of ineffective assistance of counsel cannot be documented from the record in the underlying case, those claims must be raised by petition for post-conviction relief."

22

*White*, ¶ 12. To review a claim of ineffective assistance of counsel on direct appeal we look to see whether the record "fully explain[s] why counsel took the particular course of action" and we "will not speculate on counsel's alleged errors." *White*, ¶¶ 13, 20. "[A] silent record cannot rebut the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *White*, ¶ 13.

¶46 Here it is not clear from the record whether counsel's failure to object to the repeated playing of the recordings was the result of not understanding she could preclude the repeated playing of the calls under § 46-16-503(2), MCA, and the applicable common law rule, or a strategic decision. The record is insufficient to review this claim of ineffective assistance of counsel on direct appeal.

¶47 *5. Is Oliver entitled to a new trial based on the cumulative error doctrine?*

¶48 "The cumulative error doctrine mandates reversal of a conviction where numerous errors, when taken together, have prejudiced a defendant's rights to a fair trial." *State v. Hardman*, 2012 MT 70, ¶ 35, 364 Mont. 361, 276 P.3d 839. We found an abuse of discretion in only one of the issues Oliver raised on appeal and determined the error was harmless. The other assignments of error raised by Oliver were either not an abuse of discretion or were not reviewable on appeal. Under these circumstances cumulative error does not require reversal of Oliver's convictions.

¶49 *6. Did the District Court err in imposing jury and other costs on Oliver without first undertaking an ability to pay inquiry?*

¶50 Oliver argues the District Court failed to inquire into his ability to pay fees and costs and the financial assessment imposed in the judgment must be stricken and the case

23

remanded for the District Court to conduct an ability to pay inquiry before imposing costs on him.

¶51 Oliver requested the District Court to waive "all of the fines and fees, upon inquiry of his financial situation right now." The District Court did not inquire into Oliver's financial situation. As part of the judgment, the District Court imposed the following fees: (1) Victim Witness Admin Fee of $4 pursuant to § 46-18-236(7)(b), MCA; (2) Victim Witness Surcharge Fee of $196 pursuant to § 46-18-236(1)(c), MCA; (3) Technology Surcharge of $10 pursuant to § 3-1-317, MCA; (4) Prosecution Fee of $100 pursuant to § 46-18-232, MCA; (5) Felony and Misdemeanor Surcharges of $75 pursuant to § 46-18-236, MCA; (6) Jury Costs of $2099.03 pursuant to § 46-18-232, MCA; and (7) Pre-Sentence Investigation Fee of $50 pursuant to § 46-18-111(3), MCA. This totaled $2534.03 in costs and fees.

¶52 Each of the statutes authorizing the fees and costs imposed on Oliver allow for the waiver of the cost or fee due to financial hardship in some form. *See* § 3-1-317(2), MCA (providing a "court may waive" the surcharge if it determines the defendant "is unable to pay the surcharge"); § 46-18-111(3), MCA (providing the court may waive the fee, if it "determines that the defendant is not able to pay the fee within a reasonable time"); § 46-18-232(2), MCA (providing a "court may not sentence a defendant to pay costs unless the defendant is or will be able to pay them" and requiring a court to consider "the financial resources of the defendant, the future ability of the defendant to pay costs; and the nature of the burden that payment of costs will impose"); § 46-18-236(2), MCA (providing a court

24

shall waive the fee if it has determined "under 46-18-231 and 46-18-232 that the person is not able to pay the fine and costs or that the person is unable to pay within a reasonable time"). In interpreting § 46-18-232(2), MCA, this Court has recognized trial courts must "scrupulously and meticulously determin[e] the defendant's ability to pay" jury costs to avoid undermining a defendant's right to a jury trial. *Moore*, ¶ 18.

¶53 The State concedes the District Court did not consider Oliver's ability to pay jury costs before imposing them on him under § 46-18-232(2), MCA. The State is silent on the other fees Oliver challenges. As the State concedes the court failed to consider Oliver's ability to pay jury costs pursuant to the standard of § 46-18-232(2), MCA, the other costs imposed on him must also be reversed and remanded for the court to complete this analysis. Although the different statutes authorizing the imposition of the various fees and costs have slightly different standards for when the fee may be waived, the District Court's review of Oliver's ability to pay under § 46-18-232(2), MCA, will necessarily inform its decision to impose the other costs and fees under the other statutes. We strike all financial assessments from the judgment and remand the case to the District Court to conduct the appropriate analysis of Oliver's ability to pay before imposing costs and fees.

## CONCLUSION

¶54 Oliver's convictions are affirmed. The cost assessment in the judgment is stricken and the case is remanded for the District Court to undertake the appropriate ability to pay inquiry.

/S/ INGRID GUSTAFSON

25

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE